IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
Civil Action No. 3:19-cv-661-GNS

SANDRA BOBALIK and
JOSEPH BOBALIK, PLAINTIFF,

VS

BJ'S RESTAURANTS, INC., et al DEFENDANT(S).

The deposition of DAVID COLLETTE was taken pursuant to notice via Zoom Teleconference on Wednesday, July 21, 2021 at 10:17 a.m. EST.

COURT REPORTER: WILLIAM L. BRUNER IV

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:

Chandrika Srinivasan
HANCE & SRINIVASAN, PLLC
8700 Westport Road, Suite 101
Louisville, Kentucky 40242
(502) 426-4301
mikehance@hslawky.com
Counsel for Plaintiffs,
SANDRA BOBALIK and JOSEPH BOBALIK

FOR THE DEFENDANT:

Hon. Sarah Noble
REMINGER CO., L.P.A.
730 West Main Street, Suite 300
Louisville, KY 40202
(502) 584-1310
snoble@reminger.com
Counsel for Defendants,
BJ's Restaurants, Inc. and BJ's Restaurant
Operations Company

A-P-P-E-A-R-A-N-C-E-S

FOR THE DEFENDANTS:

Hon. Edward M. O'Brien
WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER, LLP
100 Mallard Creek Road, Suite 250
Louisville, KY 40207
(502) 238-8500
Edward.obrien@wilsonelser.com
Counsel for Defendant,
Central Cleaning, LLC

Hon. A.J. Bokeno
WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER, LLP
100 Mallard Creek Road, Suite 250
Louisville, KY 40207
(502) 238-8500
aj.bokeno@wilsonelser.com
Counsel for Defendant,
Central Cleaning, LLC

Also present: Ken Miller, Videographer
Esquire Deposition Solutions

I-N-D-E-X

DIRECT EXAMINATION:
BY HON. SARAH NOBLE...................... 7

CROSS-EXAMINATION:
HON. EDWARD O'BRIEN...................... 70

REDIRECT EXAMINATION:
BY HON. SARAH NOBLE...................... 131

COURT REPORTERS CERTIFICATE............... 136

EXHIBIT LIST............................. 5

WITNESS CERTIFICATE...................... 137

ERRATA SHEET............................. 138-139

REPORTER'S PAGE.......................... 140



E-X-H-I-B-I-T L-I-S-T

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition | 8 |
| 2 | Mr. Collette's Report | 8 |
| 3 | Mr. Collette's Curriculum Vitae | 9 |
| 4 | Mr. Collette's Deposition and Trial Experience | 13 |

VIDEOGRAPHER: The time is 10:17 Eastern Time. Today's date is July 21st, 2021. This begins the video conference deposition of David Collette taken in the matter of Sandra Bobalik and Joseph Bobalik versus BJ's Restaurant, Incorporated Et Al, Case Number 3:19-CV-661-GNS. My name is Ken Miller and I will be your remote videographer today and the court reporter today is Bill Bruner, we represent Esquire Deposition Solutions. Housekeeping note, as a courtesy when you're not speaking please mute your audio and please remember to unmute your audio of course when you're ready to speak. Will everyone present please identify themselves and state whom you represent?

HON. SRINIVASAN: Chandrika Srinivasan for the Plaintiffs. Good morning.

HON. NOBLE: Sarah Noble for the Defendant,

BJ's Restaurant.

HON. O'BRIEN: Good Morning. Eddie O'Brien for Central Cleaning.

HON. BOKENO: A.J. Bokeno for Central Cleaning.

VIDEOGRAPHER: The court reporter will please swear in the witness.

COURT REPORTER: Sir, would you raise your right hand? Do you swear or affirm that the testimony you're about to give will be the truth, the whole truth and nothing but the truth, so help you God?

WITNESS: I do.

COURT REPORTER: Thank you.

DIRECT EXAMINATION BY HON. SARAH NOBLE:

Q. Good morning Mr. Collette. Can you state your name for the record?
A. David Fredrick Collette.
Q. And as I just mentioned, I am Sarah Noble and I represent a Defendant in this matter, BJ's Restaurant and it's my understanding you've been retained by the Plaintiff in this action to give some opinions. Is that correct?

A. Yes.
Q. When my office prepared the notice for today's deposition, that notice included a number of items that we asked be provided in advance of the deposition, do you have a copy of that notice with you?
A. I do not.
Q. Have you seen the notice?
A. Yes.
Q. Okay. To your knowledge did you provide everything that was requested in the notice to Counsel to be provided to us?
A. Yes.
Q. Okay. I'd like to attach the Deposition Notice as Exhibit 1. And you issued a report in this matter of the opinions that you rendered. Is that right?
A. Yes.
Q. Do you have a copy of your report with you?
A. Yes.
Q. Okay. I would like attach that as Exhibit 2 and I'll be referring to that throughout the deposition.

COURT REPORTER: So marked.



Page 9

Q. Just as an initial matter, what specifically were you asked to evaluate and reach a determination about in this case?
A. On Page 2 of my report I was asked to conduct a forensic analyses and provide expert opinions on walkway safety issues, walkway materials, restaurant cleaning and safety procedures and safety standards that apply to the incident location.
Q. And also, on that same page that you were just reading from in the next paragraph it also states that you were asked to determine the cause of the incident which injured Ms. Bobalik. Is that correct?
A. Yes.
Q. And also, we were provided with your CV in this matter. Do you have a copy of that with you?
A. I do not.
Q. Okay. But I assume you are well versed in the contents of the CV?
A. Yes.
Q. Okay. I'd like to attach that as Exhibit 3. And I don't want to go through all of

Page 10

the details of the document but I did just want to ask a couple of questions with regard to your professional experience. I see on Page 1 of your CV that you have a degree in mechanical engineering and are a qualified walkway auditor. Is that correct?
A. Yes.
Q. What does it mean to be a qualified walkway auditor?
A. Per ASTM F2948 there is a standard that outlines what you should know and have reference to to be a qualified walkway auditor. I had two courses, one from the National for Safety Institute and the dates and the - the recertification course I did are on the CV. It's a three day in person course with a practical and written exam. And then also, took a course at the University of Northern Texas, which at the time was a two day in person course. It covered the same material as the NFSI course, both based on ASTM F2948, which is titled something like Qualifications for a Walkway Auditor.

Page 11

Q. And when did you first receive that qualification?
A. I apologize, I'd have to look at the CV but 2013 or '14 (2014).
Q. Okay.
A. If you have the CV the dates are on there.
Q. Okay. We'll refer to that then. And I also see from your CV under Facility Services Walkway Management Experience Substradum Group, is that your company?
A. Yes, I'm an employee for it but I own it.
Q. Okay. And what work do you do there?
A. Substradum focuses on the cycle of walkway management, so the design plan build, maintain and insurance risk cycle around walkways and we focus on helping people step with confidence by providing products and services that help people reduce the risks and costs of slip, trip, falls and clean better and faster.
Q. So, what type of customers do you service? What's your customer base?
A. Well, 50 percent of my revenue year to date is actually expert witness work, about 50 percent is walkway auditing.

Page 12

World Trade Center is my customer, I work for companies like Amazon, Murphy's Oil. Also, do training and sales, slip meters. Like for example, our company sold the slip meter I used in this task and trained the Kaivac Company on how to measure the coefficient of frictions. We also have an online course that's a CEU unit for interior designers on how to specify materials, flooring materials and so, we teach people to select and maintain flooring. And that's pretty much what we do.
Q. You - you mentioned that about 50 percent of your work currently is providing expert testimony in litigation. Is that right?
A. Yes.
Q. When did you start doing that sort of work?
A. Per my CV the - were you provided with my testimony?
Q. I was, yes. And that - that - you anticipated my next exhibit.
A. Yeah, so, that exhibit lists - the very first case on that list is my very first



Page 13

case that - where I did a report deposition in trial. So, that date, and I apologize, I don't remember what it is right now.
Q. Okay.
A. That was the time I did official expert witness work.
Q. And the document that you're - that you're referencing is your deposition and trial experience list. Is that right?
A. Yes.
Q. And I would like to mark that as Exhibit 4. And my review of this shows that first case as 2015. Does that sound right to you?
A. Yes, if that's the date, that's the date.
Q. Okay. And this case list identifies 13 cases in which you have offered expert opinions either in deposition or at trial. Does that sound accurate to you?
A. Yes.
Q. And each of these entries on this document notes by whom you were hired to offer opinions. Am I correct in my review of this that in all 13 of those cases you

Page 14

offered expert opinions after being hired by the plaintiff?
A. In that list, yes. Right not as of today or the last couple of months I'm about 95 percent plaintiff, five percent defense.
Q. Okay. So, are there cases that are not included on this list that you're aware of?
A. That's the list of where I did a deposition or trial. I've conducted probably over 120 or 130 investigations.
Q. Okay. And that - that 120 investigations, that's where you are getting the figure that about 95 percent of those are at the request of the plaintiff?
A. Yes and it's over - over time it's I just - it's just the business model difference between plaintiff and defense lawyers. I seem to be working more for plaintiff's lawyers. It's not by design, it just happens to be that way.
Q. And these investigations that you've talked about I assume that means you're involved in cases where you have been consulted but were not identified of have

Page 15

not yet been identified as an expert?
A. Yes, like for example, some cases for Wilson Elser that never went to report or deposition.
Q. Okay. Have you worked on cases with attorneys from the firm that has hired you in this litigation?
A. I don't know. Well, yes, one.
Q. Okay. One other than this one?
A. Just this one.
Q. Oh, okay. And to your knowledge has the testimony that you've offered in any case ever been excluded from litigation or limited in scope?
A. No.
Q. Have you worked on previous cases involving slip and floor - slip and falls on indoor flooring?
A. Yes.
Q. How many times on average - or a rough estimate?
A. The - let's see, the first one on my trial testimony list there was a slip and fall in a quick serve restaurant and I'd have to see that list but multiples of slip and

Page 16

falls. I - I don't have a percentage breakdown but more than 20 to 40 in if I round up to 10s. I apologize I don't have the exact number in front of me.
Q. And of those 20 to 40 that involved indoor flooring do you have any idea how many of those involved restaurant flooring?
A. Many and I - no, I don't have an exact number.
Q. Okay. Now I'd like to turn our attention to your report. First of all do you have any additional opinions that were not included in this report?
A. At this time, I don't have any additional opinions. After I wrote this report I was given more documents that were exhibits and - and testimony from this case but after reviewing them I have not changed my opinion. Of course, never know what will show up next but at this point I have no - no thought about adding or modifying my opinions.
Q. Do you know what documents you were provided after your opinion - after your report?



Page 17

A. I don't have a specific list. I have - it was a lot of like incident reports and some - some pictures but I - I saw on some of the other depositions that there were a lot other documents I haven't seen but I gave Ms. Srinivasan a list of everything I used and so, they provided that to you, so the - the list of things that I used to develop my opinion does have more things but I didn't know how to - like there's like 90 exhibits I got and I didn't want to turn this report into 50 percent list of things I got provided. So, there are exhibits and - and pictures mostly but the depositions I used I pretty much have had since before I wrote this report.
Q. Okay. So, no additional testimony was provided after the report was written as far as you know?
A. I'd have to - I'd have to check specifically. I think there might have been one or two but again, nothing that would've modified my opinion.
Q. Okay. And I think perhaps you just said that you provided a list to Plaintiff's

Page 18

counsel of all of the documents that would've included anything that was - that was reviewed after the report. Is that correct?
A. Yes, per the - the deposition.
Q. The notice?
A. The notice, yeah.
Q. Okay.
A. Gave them a list of all my stuff.
Q. Okay. Now, in your report on pages 4 through 6 you set out 24 opinions that you've reached regarding the cause of the fall in this matter and I'm not going to go through all 24 of those in detail, I just have some that I'd like to ask you some questions about. Before I get to the opinions though I want to ask you some questions about your method for forming them. Prior to preparing your opinions and your report, I understand from the report that you did not perform an onside inspection at this property. Is that right?
A. Yes, I did not.
Q. Okay. And I also just want to clarify

Page 19

that the walkway at issue in this case at the BJ's Restaurant, that dining walkway was a wood surface. Correct?
A. Wood surface coated by a polymer finish.
Q. Okay. So, first I'd like to direct you to Page 6 of your report and the section that is - has the heading Walkway Surface Material, Selection and Cleaning. In this section of the report you discuss this wood - the wood flooring that was used, which was specifically manufactured by a company called Kahrs. Correct?
A. Yes.
Q. And you specifically discuss the standard static coefficient friction testing that has been performed on this specific type of flooring by a testing laboratory, which you identified as ABIC Testing Labs. Is that right?
A. Yes.
Q. Now, the testing that you detail in these paragraphs on Page - the bottom of Page 6 and onto Page 7, that is testing that was performed by a separate lab. Was that before - and - and - and generally on

Page 20

Kahrs flooring? That wasn't testing done to this specific flooring that was actually physically placed at BJ's?
A. That is correct.
Q. Okay. So, this is testing that was performed when? Prior to the product being introduce into this - into commerce or do you know?
A. The Kahrs testing?
Q. Yes.
A. Well, so, the - the way I do an investigation is I start with a material selection and - you know, a reasonable safe walkway has a - using standards and has a specific slip resistance or - you know, scientifically a coefficient of friction and the - the material selection component, normally you do to the manufacturer for the details. So, that's why I integrated the Kahrs data just to understand it because I don't know what the surface of the floor was prior to Foster Flooring applying the Bona Anti-Slip. So, I wanted to start with what was the design considerations for picking that



flooring, what was - what was the specifications given just so I could start with the basis. Because once the Bona Anti-Slip is on there you're basically walking on Bona Anti-Slip, so I started with the material selection decision process and that's why that Kahrs is there. So, I don't actually know if that - because I couldn't see in any testimony what type of Kahrs Flooring was installed and if the Kahrs Flooring went in as manufactured or if they had changed a coating prior to it. But again, just from the design consideration and selection of the flooring to start with, wanted to start with what should it natively be because - and then the conversation evolves to the Bona Anti-Slip. So, that's why that data is in there.

Q. Is it important to know what type of Kahrs Flooring was installed in order to analyze the hazard - the potential hazard of this floor?

A. Yes because my analyses is the starting with material selection, like what was the

thought process and material selection process that put wood flooring in a restaurant and it starts with the material specifications. So, that's why I started with what Kahrs natively should be so that I could start with a baseline and then evolve over the - of the testimony and information I got.

Q. And you said that that specific type of - of Kahrs Flooring was not information that you were able to determine from the materials provided?

A. No, even BJ's doesn't seem to know exactly what type of wood flooring it was because Kahrs has two type of wood flooring they provide. One is an actual piece of wood and the other one is manufactured wood, so it's got like a...pressed board, is not the right word but something that's most of the volume of it and then they put a thin layer of wood veneer on top. So, I wanted to start with well, what - what does Kahrs provide with customers with specification information and that's where the - I looked for what Kahrs is providing

the material specifiers, the interior designers or architects with information. So, that's why I started with what - what does Kahrs give their customers to start with.

Q. And the difference between those two types of flooring, is that something that would be obvious visually?

A. I don't know. I've never seen this flooring other than looking at Kahrs itself. Because you're actually looking at the surface of the wood it - it would look like wood. That's why they - it's probably just a lower cost option to get a structured wood piece. What you're walking on is wood, just a very thin slice of it. So, it'll look like wood, so I - if - if you and I were standing on a floor that had both of those things on it I don't think we could tell the difference. But the visual part of it isn't what I was really - I wasn't concerned with, it's really the - the material specification of the coefficient of friction. And that's - it seems that they - in that testing did

both because it's basically the wood itself, even as manufactured by Kahrs has something put onto it to stop you from having bare wood that you could damage. So, there is some set of coating on top of Kahrs and that's why they used the D2047 static coefficient friction test because that is the appropriate test to start analyzing coefficient of friction for a coating.

Q. And what is the static coefficient of friction? What - what is that?

A. It's a physics based formula that basically says the weight of something bound in a stationary position is then pulled sideways 90 degrees and when the thing starts to slide and take the ratio of the force to pull it and the ratio of the force down and that's the coefficient of friction. And - and the static part is because basically a stationary weight is pulled sideways, then you divide the force sideways by the force down to come up with a number. In this case D2047 has a specific test method, so you and I could -



Page 25

I literally could have you stand on a floor and pull your feet sideways and get the same kind of number but D2047 is like a scientific standard that defines a specific test method to calculate that static coefficient of friction.
Q. And obviously there are different types of flooring that can be installed in public places, such as restaurants and not just wood flooring, there's lots of a variety of materials that can be used. Correct?
A. Yes.
Q. And are there different testing standards for different types of flooring material?
A. Um–
Q. I assume all test - all flooring isn't created equal in - in terms of coefficient of friction testing.
A. I - I think - so, wood flooring doesn't have a test method, coatings do. Tile - I'm on the Tile's Standard Committee, it has a - an anti-standard called A326.3, which is the standard I used to measure this flooring surface with and it's the one that is used by tile manufactures to

Page 26

provide specification guidance to interior designers or specifiers that's incorporated into the manufacturing spec for tile, ceramic and porcelain. The - so, there's two types of flooring, there's manufactured flooring and then there's flooring that's manufactured in place. So, concrete or terrazzo are manufactured in place. They - they don't have a standard incorporated into their manufacturing spec, tile does, coatings do. And in this case, most wood floorings or a vinyl flooring for example will have a floor finish put on top of it, so the manufacturer will start with that D2047 if it's a polymer, the A26.3 is all - all tiles. And then you can use a National Floor Institute Standard, either the B101.1 Static Coefficient of Friction Test or the B101.3 Dynamic. And the B101.3 Dynamic and the A326.3 Dynamic are very close test methods just managed by two different groups of standards rating bodies. So, a long way around to say the - all flooring will have a coefficient of

Page 27

friction and you can only really tell what it would be by using a - a published test method to give you data on what the coefficient of friction's going to be.
Q. Now, do you personally perform any testing on any flooring product in reaching your conclusions?
A. Yes.
Q. And I think on Page 7 you detail that testing. Is that right? Page 7 of your report?
A. Yes.
Q. And it - it looks like you mixed and applied four coats of the Bona Traffic Anti-Slip to three vinyl composition tiles per the method outlined in the Bona technical instructions. So, that Bona floor finish, is that the finish that was utilized in the BJ's Restaurant flooring at issue here?
A. Yes.
Q. But as we just mentioned, the flooring in the restaurant was not vinyl composition tiles. Correct?
A. That is correct.

Page 28

Q. So, the flooring pieces you used for your testing were not wood flooring such as exist at the BJ's Restaurant at issue. Right?
A. That is correct but the D2047 standards specifies you use vinyl composition tile. You can use wood flooring but it - they actually specify a type of wood flooring you can use and in my opinion and from my experience the wood flooring at issue is very, very smooth, meaning there's not a lot of vertical surface variation, so it's basically the same surface roughness and vertical variation as the vinyl composition tile I used. If, just as an analogy here, if this - if the surface had been polished concrete, I'll rephrase that, rough broomed concrete like a sidewalk that the Bona had been applied to and then I had done the test on the vinyl composition tile that was very smooth I definitely would not say those would be equivalent tests, but because I used a smooth vinyl composition tile that's as smooth as the - the - the wood flooring



Page 29

you're basically in both cases testing the surface of the polymer finish. And polymers are basically liquid plastics and from my time at Johnson Wax Professional, they also make Saran Wrap, so floor finish is basically like putting a liquid Saran Wrap down on a floor that hardens so you're walking on the polymer. So, in both cases here the test I did was on the surface of the Bona floor finish on a very smooth surface that's equivalent to the smoothness of the hard wood. Because you're not really walking on the hard wood.

Q. Now, this will sound like an elementary question perhaps but what are the differences between wood flooring and the vinyl composition tiles in terms of their - just in general what are the differences in the composition of those two types of flooring?

A. I am not a wood floor specialist and I don't manufacture vinyl composition tiles but the - the critical specification for me in this test is surface roughness. And

Page 30

again, if this wood floor had been a rough board like - I forget what the steakhouses - there are some restaurants that use rough planks that are - are rough. And again, my analogy back to the - the concrete, the critical dimension or the characteristics for me is the surface roughness. So, the surface roughnesses are equivalent, they're both smooth. Other than that I am - I'm not a vinyl composition tile manufacturing expert. I only worry about the top of it that you walk on. And again, both of these - my test material and the Kahrs wood floor surfaces are very smooth. So, what that means is when you pour the liquid plastic basically onto the floor and it hardens you have an equivalently smooth surface to test. And again, the - the D2047 test is - requires you to use a smooth surface and even specifies in the standard that you can't do this on a rough surface and - and still use that .5 value that they refer to. So again, the - the critical spec for me is how smooth it was and the rest of

Page 31

that I'm not an expert on the construction of wood flooring and the construction of VCT.

Q. Is it to be expected that vinyl composition tiles or VCT and wood flooring would react differently or display different properties when finish is applied?

A. That's a great question and if one of things I see in the case that - that - that BJ's actually asked Ecolab to do a - like for example, a chemical test on the epoxy flooring in their kitchen but I didn't see any detail about their - their chemical testing of the - the interaction of the chemicals with the floor finish. I also didn't see any - any discussion of - of the material selection of the wood versus anything else. And so, I really don't know how to answer that question.

Q. In your experience do you - you don't have any experience that would inform an opinion as to whether those two types of flooring would have different absorption or - or other values when finish is

Page 32

applied?

A. Well, from my experience of developing floor finishing projects, I actually launched floor finishing applicators for Diversity, one of them being called the Pro Speed, one of them called the Trailblazer and I have a lot of experience applying floor finishes in some of our key customers when I was at Diversity, including Target and Walmart and Walgreens. And Walgreens, for example, uses VCT. Walmart, as you can see in a lot of their Walmarts have removed the VCT and gone to polished concrete. The polymers really are - are - I'll say, don't really care about what's underneath but they're designed for different materials. And again, I'm not a - a formulating chemist for epoxys and - and polymers. My main experience is what happens when you put it down and - and how - and the - the slip resistence and the maintenance part of it. So, I'm sure there are differences when you get down to the layers between the surfaces of the



Page 33

substrate, by the way that's why the company's call Substratum , that's what interior designers call the horizontal plane of the built environment. So, the substrate that's selected, whether that be wood, tile - I noticed BJ's was putting floor finish on the slate for a while and then - then said you can't put floor finish on a slate anymore. The - I'm not an expert on making polymers stick to the surface and what happens to the surface. And even if there's a - in the standards committee I'm on I know there are specifications for the characteristics of the polymers but I - I - I don't really have a - a technical expertise on what happens sort at the boundary layer because my particular investigation and my experience is what happens at the top of the plastic layer when it hardens.

Q. So, can testing one type of floor material, such as VCT, with Bona Finish applied tell you the results that would occur if you had applied that same finish to a different type of flooring? That's

Page 34

my question.

A. Well, I - I don't understand what you mean by results.

Q. Well, I guess I'm just interested in why you didn't perform your testing on wood samples instead of VCT since wood - I understand what you're saying about the - the surface roughness being the same but would it have been possible to perform your test with the Bona Finish applied to wood - to a wood surface?

A. Yes, I could've done that but it wouldn't have made a difference to the - the - the coefficient of friction measurements on the top. Again, the surface roughness of the wood is very smooth and the surface roughness of the VCT is very smooth. And I wasn't testing like will the polymer delaminate or - or - or wreck the color of the wood . Because you're basically putting liquid plastic down on a surface, as soon as it hardens all I'm doing is measuring the coefficient of friction. So, it - it didn't - didn't make a difference to me if I actually had done it

Page 35

on wood or VCT to take the coefficient of friction measurements.

Q. How were you able to determine that that surface roughness was equivalent or it sounds like you think it may - your position is that it's - that equivalent is enough, it doesn't have to be identical. Is that right?

A. Well, the - it's one of the things I'm working on with actually the polymer guys and the tile guys. Right now there is no specification for a minimum threshold for surface roughness measured in micrometers. But the research in Europe where the United Kingdom's equivalent of OSHA, the HSE, I think it's like the Health and Safety something or other, HSE has done research and said that any surface roughness below 10 micrometers actually is - has a very high probability of slip. And you - quantitatively, and I think in my report I measured the VCT, you can see it's very smooth. I did not have a sample of the Kahrs flooring to test because I couldn't - I couldn't identify which

Page 36

flooring they were using. But wood flooring by definition is very smooth and I can see in the images that I was provided that the flooring that was installed was very smooth and they were applying a floor finish onto it that appeared very smooth. And you - visually I can't quantitatively tell you by looking at a floor how smooth it is but to get above 10 or 20 micrometers a - a - a - like the epoxy floor that's in the kitchen, I've never seen it but I'm sure that it's more than 10 micrometers. So, anything that's smooth looking would be quantitatively equivalent to between wood and VCT. But again, once you put a polymer Bona on it and it's - even if the surface roughness was double on a wood floor but still under 10 micrometers the polymer will level inside any of the surface roughness. So, the surface you're standing on is still going to be smooth, so I did not need to go find a piece of wood to - to test because the VCT per D2047, you can use VCT to pull the number



Case 3:19-cv-00661-RGJ-LLK Document 98-1 Filed 10/15/21 Page 10 of 35 PageID #: 3322

because it's testing the polymer, not the surface of the wood.
Q. And you said you didn't have - you didn't know the specific type of Kahrs flooring used but there are only two options. Right? The wood and the artificial - not artificial but the one that's just a wooden surface with artificial under it?
A. Yeah, well, so the other part of this is when that floor was installed I actually have no idea what was done to it after the fact. Did it come with a finish, did they add finish later? But again, because the Kahrs flooring is very smooth and the VCT is very smooth and you're pouring liquid plastic on it, the Bona, once it's hardened it's a smooth layer and the key characteristic is the coefficient of friction and that's what the standard wants you to do. They - they don't ask you to go get a rough surface, they want you to use a smooth surface so you can disconnect any mechanical interactions of the testing device. For example, if it was very, very rough and you had no finish

on it it would be a very high static coefficient of friction. So, what they're doing is making sure that the test method that they use has a smooth surface so you're actually testing the coefficient of friction of the polymer. So, in this case the Kahrs floor finish is very smooth, the VCT is very smooth, so surface roughness doesn't come into it. It's the - you're actually testing the surface of the liquid polymer.
Q. And to do that test I - I see on Page 7 you used something called the American Slip Meter 925. Is that right?
A. Yes.
Q. And is that what is referred to as a tribometer?
A. Yes.
Q. Easy for me to say. Right? And what is tested by the tribometer? What do you determine with that?
A. With a tribometer or with the ASM 925?
Q. With the ASM 925 specifically.
A. Yeah, so, the ASM 925 measure the dynamic coefficient of friction.

Q. And is that one of a number of options of that type of device that you could use?
A. Yes.
Q. And why did you select that one specifically?
A. Well, it's the one I train people to use, it's the one I have. It's also, for example, like the one I - I personally trained Kaivac on how to use and why I use that one is because the ceramic tile manufacturers are specifying dynamic coefficient of friction using that A326.3. So, I use the ADM 925 because I do a lot of testing on ceramic floors. It has a - the A326.3 is an AMC published standard and the ASM 925 has finished an interlaboratory study to show that it's - has - creates reproducible and repeatable results and - and it's fairly easy to use and it's light.
Q. You referenced the - the ACM standard, is there also a standard from the National Floor Safety Institute, NSFI about these types of meters?
A. Yes.

Q. And are - do you know whether NSFI recognizes that ASM 925 as an appropriate tribometer to use?
A. Yes, as of like two weeks ago the NSFI finished and approved the interlaboratory study for the ASM 925. I'm uncertain if they've updated the website yet but I actually got a call from a manufacture a couple of weeks ago saying hey, great, we - we have now finished our ILS. So, yes and I apologize, I never get the words right if it's approved or authorized or certified but they have done statistical analysis of the performance of it and it should be on their website soon or already is.
Q. Okay. And you said that that has happened within the last two weeks or so?
A. Yeah, I think it was post July 4th.
Q. Okay. So, at the time that you did this testing was it approved?
A. I don't know. Well, I had it submitted there - actually I don't know.
Q. Okay. Now, I would like to direct your attention back to your report and



Page 41

specifically Pages 5 and 6 because I have a question about a couple of the numbered opinions that you provided there. Specifically - actually I think these may both be on Page 6, I apologize. Specifically Number 20, which states, "BJ's knew or should have known that pedestrians aren't reasonably able to visually identify walkway surfaces that are a dry slip hazard." What is a dry slip hazard?

A. Well, a dry slip hazard is when you are looking at a walkway surface you can't quantitatively assess the coefficient of friction by looking at it. And it's one of the things that's a theme throughout my analyses of this, is BJ's was continually over a long period of time having slip and fall problems on both dry and wet floors. A wet floor, I'll start with that one, you can see the contamination and you - and a wet floor provides a very high potential slip. Unlike - and I notice they - they - I forget what they call it, their hourly checks or something but they're spot

Page 42

cleaning every hour. I mean that's - that's to - you know, it's - it's very obvious if you drop a plate of spaghetti that it's a slip hazard, it's an obvious, like there's something there you can step in and - and - and create a slip hazard. Water also, and water being a very thin liquid as opposed to oil on the floor. But when you get to a dry hazard you - there's no visible contamination that you can point at and go oh, we've got to spot clean that or people know that if you step in a puddle of water that it potentially could be slippery because it's a lubricant. When you get to a dry hazard there is a coefficient of friction that you - you start to get below that can create a hazard and it can relate to - and I know they - it always has interested me because it's - it's a qualitative statement, I see a lot of people say is it a slick or greasy floor. And slick or greasy, when I read that people are basically saying that they can see or feel something on the floor but they can't see

Page 43

it. And that's what I mean by dry hazard. There's a contamination on the floor that is reducing the slip resistance but you can't see it. And - and there are many reasons why that can exist but it's - it's not visible. But if you take a slip meter and start analyzing a quantitatively you can start to see through the numbers what - you know, is it a hazard or not. And that's what I meant by a dry hazard. You can't see a dry hazard until you encounter it and then the words start coming out slick or greasy or there's something there, there's a haze but you can't quantitatively assess it that way.

Q. Now, when looking at the cause of a specific slip and fall incident, would you agree that it's important in analyzing the cause of that incident to know whether the surface at issue was dry or wet?

A. Well, so the - the interesting thing about like material specifications and maintenance is a facility, like an interior designer or specifier has to select a reasonably safe walkway material

Page 44

for use. And if - for a floor, for a flooring for the 40th building - 40th floor of an office building has a different requirement than a - a - a restaurant. And so, there's - there's some things you can do there to pick the flooring properly. Because in a restaurant it's reasonably foreseeable you're going to have things tracked around, you're going to have spills and I see BJ's is constantly worried about spills and - and cleanups every hour. But it's the - the - the dry hazard concept comes from the facility use. So, in an office building on the 40th floor it's not reasonably foreseeable you're going to have food tracking going around or have a lot of soils moving around. And then, of course, there's the cleaning process and you - you can select a flooring material for use. And that's where it all starts.

Q. Now, specifically with regard to your formation of your opinions in this matter, was it important for you to know whether this specific floor was wet or dry at the



Page 45

time of the fall?
A. Well, so the - the - the data I was given is, again starting with the material of the flooring is why I started with that. Because the research I did and the testing I did shows that this flooring, the Bona flooring, was probably not suitable for use in this restaurant environment. And when wet it would absolutely be a hazard and when dry it's on the - it's - it's on the edge of being hazardous just by itself. And if you start adding dry soils, either from things being tracked around during the day or cleaning process leaving something on it, it - it - the - the - in my opinion the combination of the flooring selection and the maintenance created a hazard regardless if this thing - if she had slipped - for example, in this case if she had slipped on a - a dry or wet floor for the average person walking through it.
Q. So, what is your opinion? Was the floor wet or was it dry in your analysis? What did you use?

Page 46

A. Well, I got conflicting message in the testimony. Most people say it was dry but slick and greasy and had a haze on it and that's most of the BJ's people. And then one of the, I forget what her name was, like the person that - that saw - saw - actually I shouldn't say saw her fall, I don't know if she saw her fall or not, but testified that she thought the floor was wet. If the floor was wet at the time of the incident that definitely was a hazard. And if - if - if she was wrong the floor also was a hazard because it was just naturally at the very low end of suitable for use in a restaurant And with the testimony from BJ's and - and even Ms. Bobalik about the greasy, slick, haze conversations that went on for at least a year prior to the incident, that didn't make a difference to me whether it was wet or dry based on everything that built up to the incident.
Q. Do you agree with me if there are multiple factors that contribute to a slip and fall event?

Page 47

A. Yes.
Q. And we've talked a lot about the ANSI and the NFSI standards in other - regard to other things so far during your testimony today but I think I've seen standards from those institutes that refer to basically three categories of factors being physiological, social/emotional and environmental. Are those familiar to you? Am I - am I stating that correctly?
A. Yeah, well, as a matter of fact, the course they teach to interior designers on material selection has this little section on slip resistence and the factors that are incorporated in it. The material selection is a very key part of it, the contaminants are a key part of it, the person themselves is a key part of it and their footwear are a key part of it. So, in this case Ms. Bobalik didn't seem to have any human factor issues. I am not a human factor issue person, it's not my thing because I build my opinions and the work we do with facilities from the floor up. The floor, the maintenance and then

Page 48

the - the pedestrians. And is this case Ms. Bobalik didn't have a cane, she wasn't infirmed, she was a reasonably foreseeable pedestrian walking across a restaurant. And I looked at her footwear, I got pictures recently and I - I - I forgot what footwear company she was wearing, absolutely reasonable footwear. So, I did not assess her shoes and I did not assess her because in my opinion the cause factors here are the floor material specification and the maintenance and the - the oversight operations caused a hazard for pretty much anybody walking through there, it just happened to be Ms. Bobalik's turn.
Q. So, if I understand your testimony correctly, you agree that there are generally speaking multiple factors to be considered in determining the cause of a slip and fall but in this specific incident all that was relevant to you was the condition of the floor?
A. Well--
HON. SRINIVASAN: I'm sorry, let me get an



objection. Objection to form.
WITNESS: Yeah, so the - the condition of the floor is an - is an interesting way to phrase it because my - my opinion basically and I - I know I didn't say the word reckless in here but watching and - watching is the wrong term, reading all the testimony and looking at documents BJ's started off with a floor that probably I would never have specified if they'd asked me for my opinion on what floor and then they - they seemed to be reckless between operations in facilities and risk management and it took me a while to decipher who was doing what and who was responsible. So, the - the condition of the floor here is a result of the - the - the facilities, I'll rephrase that, the material selection by BJ's and I noticed

they stopped using wood flooring over - and - and then the - the - the maintenance management and then what they didn't do to - to look at as Ms., I forget what her name is, Castellon or Gina, talked about opportunities. She kept talking about opportunities but didn't do anything about it. So, the condition of the floor builds up from all these factors, so I absolutely agree with you there's - it's - when an incident occurs and I can't speak for any specific incident, well this - except this one, there are definitely multiple factors that - that go into why a slip and fall occurs.
Q. And are any of those multiple factors, factors outside the control of the premises owner or manager?
A. In this case, no.
Q. So, you don't believe that there were any factors in those physiological or

social/emotional or environmental, such as footwear that had any impact on the occurrence of this fall?
A. I - I can't speak to Ms. Bobalik's physiological, emotional state. I can looking at her footwear because both Tera and I are on the F13 committee and part of our committee is the footwear group and I - the - the - without - and I looked up that footwear company to see if they were part of the committee and I - I couldn't find them but they're - they're making footwear that's absolutely reasonable for someone to be wearing and it's - the - again, back to what I was saying, is if you pick the right flooring and you maintain the right flooring - sorry, maintain the flooring properly or reasonably for use you mitigate the risks for like the average pedestrian and - and - and again, I'm not putting forward an opinion on her physicalness or emotional state but her footwear is absolutely reasonable.
Q. With regard to her footwear do you agree

that heel strike and the wearing away of the bottom surface of footwear over time can be a contributing factor to a fall?
A. I am not a human factors expert. Again, I - from the floor up in this case the - the - as I reviewed the testimony the material selection and the maintenance caused a hazard for anybody, it just was Ms. Bobalik's turn.
Q. So, is it your opinion that it wouldn't have mattered what kind of footwear was being worn, that would not be a consideration as to the cause of this fall?
A. To this fall or any fall?
Q. This fall.
A. Again, the - I don't have - there's no video of her foot strike because I mean it's cut off. Her - and her footwear is reasonable. Though it - I don't think there's anyway for anybody to analyze this fall from the human factor side because you can't see how she struck her foot. And again, I'm - I'm not an human factors expert on - on how she stepped in this



Page 53

particular case because the cause factors in my opinion, as I mentioned, come from the material selection and the maintenance.
Q. Does the type of sole on a shoe or the presence of a heel or a wedge impact the likelihood of a fall?
A. Those are different kinds of shoes but for example, the - a - a women wearing high heels, which with a- stiletto-- probably didn't look like she's going to be wearing stilettos very often. But a high heel shoe is a perfect example of where footwear can be a contributing factor because at the tip of the heel of most women's shoes use a very hard plastic, and I'll say you guys because I don't wear high heels, you guys don't want that heel wearing out so they put a very hard plastic there. But that very hard plastic is also a great high slip surface because it has a very low coefficient of friction on pretty much any surface. So, if she had been wearing a high heel, yeah, that could've - that could've been a thing

Page 54

because that happens. In this case she was wearing reasonable footwear and acted reasonable walking across. You can see it in the video, she wasn't running and - but again, from the human factor side I don't have an opinion on that but her footwear looked reasonable.
Q. What about the instability of the foot inside the shoe, such as with a sandal? Does that impact the likelihood of the possibility of a fall occurring?
A. I don't have an opinion on the human factor side of that.
Q. But you agree with me - or well, actually I won't - I won't state it that way. Do you agree with me that footwear can be an important factor in determining the cause of a fall?
A. Yes but not in this case.
Q. What kind of footwear was Ms. Bobalik wearing?
A. The case notes that I provided I think say it in there somewhere. I don't remember. It's - it's like a four letter word, like a–

Page 55

Q. Well, I don't mean the brand, I mean what was the structure of the shoe?
A. And I apologize, I'm not a woman's shoe expert so I don't know if you - if you guys call it a wedge or a sandal or a sandal wedge but it - you know, had a - a - a slight heel, strapy toe things and - and it looked like a standard synthetic rubber sole.
Q. You've given the opinion that the shoes she was wearing were reasonable, what considerations do you include in making a determination of whether shoes are reasonable?
A. Well, as you mentioned if she had been wearing a high heel - you know, there - there - potentially the interface between the surface of the floor and any contaminants on it and that heel definitely would be a discussion. But in this case they're just - I had to say it, reasonable old lady shoes that have a synthetic rubber sole.
Q. And your report doesn't make any reference to the evaluation or analyses of her

Page 56

footwear does it?
A. No, again, because as I started reviewing this and looked at the flooring material and the cleaning process and the testimony the - the - the flooring material and cleaning process and then the repeated conversations inside of BJ's about the - the haze and the slick, greasy surface it just increases the probability and in this case it's - it was just Ms. Bobalik's time to step in a spot that she was going to slip.
Q. Is it fair to say that you didn't analyze or evaluate any other possible factors other than the flooring in forming your opinions?
A. I'm not sure how to answer that.
Q. Did you consider and analyze any other factors that could contribute to this fall other than the flooring?
HON. SRINIVASAN: Objection to form but go ahead.
WITNESS: Yeah, well, the - the cleaning process and the - the maintenance of the cleaners and the feedback internally between



Page 57

BJ's. I think all my opinions are stated in what I used as the basis looking in.
Q. And none of those factors that you evaluate were included in those physiologically factors or social/emotional factors that we talked about earlier. Correct?
A. Well, my Opinion Number 21 actually it's - I - I state on Page 6, "Is affected by expected pedestrian footwear, variations in pedestrian gait." And basically that would be I'm recognizing the two things that you're mentioning, that the footwear and the gait, which is the person. But again, you have to design the built environment for, I'll use the word reasonable foreseeable pedestrian and a reasonable foreseeable contaminate level. And my opinion is BJ's seems to have picked a bad floor that - and - and had maintenance and management problems so that it's increased the risk for all pedestrians, not just Ms. Bobalik.
Q. You reference in your report the number of

Page 58

slip and fall incidents that this restaurant had had. Do you know how many patrons this particular BJ's restaurant has on average during a week?
A. Well, so, that's interesting because for example, A326.3 the coefficient of friction values are based on (audio cuts out.) probability. So - so, the work I do at the World's Trade Center, you have three to 400,000 plus people using their subway station everyday. So, they have millions or people going through their subway station. They actually have a couple of slip and falls a week and - and so, they - and they have to manage the floor materials and the cleaning processes. So, if - if BJ's is has a million people a year they should have a - you know, an expectation of a certain threshold that in a slip probability of one in a one million. So, the long - the short answer is no, I don't. I do see the - the - they have - so, the risk management - I can't - and i don't remember if it was by customer or revenue

Page 59

but there is - I'd be surprised if they have a million people a year in there. If they did they - they should have like a slip and fall a year. And - and slip and falls are probability events and I - I - I - the wording I've used is there's no such thing as a safe floor. There's a reasonably safe floor and so, the - that's exactly why you have to pick the flooring material and the maintenance processes to meet a reasonably safe floor. So, at the beginning of this whole design/build process for a BJ's Restaurant, they should know that and they should develop a maintenance process to manage the floor based on their customers so it doesn't - it - it should be a - the number of customers doesn't really make a difference to me because they should've built that in in beginning and my analysis says it's much lower than it should be.
Q. This incident obviously happened in a restaurant and I - I believe we've talked about the fact that you have provided expert opinions in other litigation

Page 60

involving restaurants. With your experience are you familiar then with the food safety code and what it requires of restaurants in terms of walkways?
A. Yeah. Well, it's interesting, I think Terra has been on the other side of this multiple times with her - like the food safety code is an interesting thing. Its - its floors have to be cleanable but the food safety code isn't based on pedestrian walkway safety. So, the A326.3 is based on research conducted like 20 plus years ago in Germany and it's - it's the basis of the research for like the - the German walkway safety codes. And so, the food safety code more relates to don't kill people by serving them bad food and make sure you don't spread germs but it's not focused on scientific analysis for the risks for pedestrians in a restaurant.
Q. Would you agree with me that that code though requires restaurants to have smooth walkways for purposes of cleanliness and sanitation?
A. Well, I mean if that's case I put slate



floors in that had a rough surface because they definitely will collect things. So, it's - it's an interesting conversation because they also put epoxy floors in that are probably not smooth at all on purpose so they don't - people don't slip as employees.

Q. Finally, turning to Page 9 of your report, this is a section titled Risk Management and in the final paragraph, I think actually the final sentence of the page you state that you weren't provided any testimony demonstrating action by BJ's to evaluate the condition of the floor by measuring slip resistance of the flooring material and the floor finish. Do you mean that there - that you don't believe BJ's did that after this specific fall or prior to it or what - what specifically is the criticism that you have there?

A. That's basically meaning I have a lack of testimony, so the information I've been provided they - they didn't take slip resistance measurement as they've had these problems. There was some testimony

by Mr. Murr's boss and I forgot his name, the head of operations, that they had hired somebody in California to do some test measurements way back when but that doesn't help in this particular scenario. And by the way, it's - it's not that all BJ's are going to have these issues. I mean it's - that's the value of risk management in analyses of walkway safety. I bet you the majority of BJ's have very few problems. I mean it's - it's the - but I'm only looking at this case - you know, so they have at this time I think 220 restaurants and this one's having a problem and it's the bottom of the risk management reports and - and - the - the insurance company and I forget - oh, actually it's above it, Allied World Insurance even talks about how they provided BJ's with access to the National Floor Safety Institute to evaluate stuff. And it's - it's one of my criticisms of - of BJ's is when they have all these problems you can quantitatively assess it to - to analyzing, as Gina kept calling

them, the opportunities because I don't know exactly what caused this thing. Is it cleaning, is it - is it - is it dirt, is it - it's just this combination of stuff that they could have solved if they'd started actually quantifying the slip resistance. I didn't see that at all. The - the - I don't see any evaluation of the slip resistance when they put the wood flooring down. So, they - they - they - for example, they talked to Ecolab and I mentioned did a chemical analyses of interaction with the epoxy but I don't' see anything that said they - said hey - you know, we're going to do something to your restaurant, as operations I'm realizing seems to be Mr. Murr and that group, were the ones who said we're going to put this flooring in. Sorry, facilities, not operations, I keep getting that wrong. Facilities, they never actually quantified the slip resistance of the - of - of the floor finish and the problem with that is all these standards have a caveat. D2047 has

it in it, B101.3 and A326.3 all have, I know I'm sitting here with a bunch of lawyers but these are words written by lawyers that way these standards do not take into account all conditions, so you're - you are responsible for selecting the minimum threshold for use for contaminants and - and - and cleaning processes and that whole thing. So, they - if they'd evaluated what needed slip resistance was before finish and then went alright, what's it going to be once it gets in there and the - never went in and actually measured the floor finish when they had the problems. And then the other thing is I - I didn't see any testimony where they actually looked at the wood floor cleaning procedures of - of Central Cleaning. They - the - I'm going to get her name wrong, the GM of the BJ's is - is talking about stuff and the - the - the other managers who was doing the safety committee stuff, they - they - they talked, they're saying they have a problem but they never actually in anything I saw,



Page 65

I grilled Central Cleaning on it, what exactly are you doing and then quantitatively measuring things and changed anything. And I'm not saying they didn't do it, I'm just saying I haven't seen any documentation that says they did.

Q. When you referenced the existence of other falls, do you agree with me that the individual circumstances for each fall are important in determining a cause of the fall?

A. Yes, from the data I saw and in my notes I went through every single incident report and recorded, I think I tried to record the location but I also recorded the time and whether it was wet or dry. And there are a lot of falls that occur way after Central Cleaning has been there and dry and wet. And I - I think like there was - there's falls at 7:00 at night - you know, and that's - it's - it's - you know, actually - this is actually an interesting problem for me because this is exactly the stuff I do, is going in and saying let's quantify what's going on and see where

Page 66

the, as Gina kept saying, the opportunities are and then look at risk factors. And - and it's the - the overall summary I have of this is - is the - BJ's knew they had a problem and didn't do all this stuff that you just asked me about on those last things. And if they did I don't have the testimony or any documentation that says they - they did.

Q. With regard to risk management in businesses in general is it your opinion that a business is expect to completely eliminate all fall occurrence on its premises?

A. Well, as I mentioned, the - the dynamic coefficient of friction values, for example, are based on the probability of that and - and the research shows that we can walk on a surface and don't quote me exactly but it's like .25, .3. We can ambulate on a surface reasonably well but then you have to consideration different people. So, and then you can evaluate that number for statistical analyses. I never did, I'm just the recipient of the

Page 67

data. But .42 gives you a one in a million probability and - and slip events and that's why I keep saying reasonably safe, you can never have a safe floor. There's - there's absolutely no way you can stop a slip and fall and guarantee it. By the way, D2047.5 is based on a 1953 Federal Trade Commission rule that let them in 1953 advertise a floor finish that was slip resistance if it had above a .5. Rule 4 said you can never say nonslip. It was a - legal is probably not the right word but the FTC said you can't call something nonslip because it doesn't exist. There's always a risk and that's what risk management's supposed to be doing. If we're having problems, what do we do about it? Managing the risk and start with picking the floor. I understand that's operations, not risk management. Maintaining the floor, also operations. Then all these reports are going to risk management and they don't seem to be managing the risks. Gina walks in, does some things and then wonders back

Page 68

out again but doesn't help the general manager and the other people in there manage the risks. And that's - that is a - is - is a very long answer to say no, you can never stop slip and falls but you can manage the risk and BJ's didn't do that.

Q. Evaluation of risk management, is that something that you've been trained in?

A. I'm not sure what that means, evaluation.

Q. Well, you've - you've given opinions about risk management procedures and whether they were suitable or not, have you received training specific to assessing a risk management practice or policy?

A. Well, that's a great question because risk management is a - is a funny term because risk management at BJ's is a title in an organization. It doesn't seem to be an activity with focused deliverables. And so, I'm a fellow of the Claims and Litigation Management Association and they seem to be the - the administrators of risk things. So, risk management has a lot to do with things like Workers' Comp



claims or water damage or the building burnt down. That's not my world. I am very specifically focused on managing the risks of walkways. And in this case this risk management is not the title of BJ's organization, this word is about managing the risks of the walkway.
Q. And that's what you were referencing on Page 9 with the heading Risk Management?
A. Yes, that is not risk management BJ's, that's risk management as in a practical executable activity of walkway safety.
HON. NOBLE: Okay. I think that's all the questions I have for now Mr. Collette.
WITNESS: Thank you.
HON. NOBLE: Thank you.
HON. O'BRIEN: Mr. Collette, I do have some questions but can we take about a five minute break and then come back?
WITNESS: Yes sir.
HON. O'BRIEN: Okay. Thank you all.
VIDEOGRAPHER: Are we all in agreement to go off the record?

HON. O'BRIEN: Yes.
HON. NOBLE: Yes.
HON. SRINIVASAN: Yes.
VIDEOGRAPHER: We are all in agreement to go off the record at 11:32.
(OFF THE RECORD)
VIDEOGRAPHER: Is everyone in agreement to go back on the record?
HON. O'BRIEN: Yes.
VIDEOGRAPHER: We are all in agreement to go on the record at 11:43.
CROSS-EXAMINATION BY HON. EDWARD O'BRIEN:
Q. Mr. Collette good morning. I am - my name is Eddie O'Brien and as you probably know I represent Central Cleaning in this lawsuit. I do want to ask you some questions about your report and conclusions. But I wanted to start actually kind of with a - with a fundamental question. You know, this a - this is a 11 page report, you make a number of conclusions and opinions but I want to just ask you directly what do you believe was the cause or causes of Ms. Bobalik's fall at the BJ's Restaurant?

A. That's a great question because in my analyses always starts with the material selection, start with the floor. Like for example, if they had installed ice, not that they would do this, but they installed ice as the floor into a restaurant in Louisville, Kentucky probably a slippery floor. Start with the floor. So, that - that's why I start with - I always start with the flooring material. Then it goes to the maintenance because slip resistance and - and how we walk on a surface is really like a three layer cake. The bottom is the floor material, the top is your footwear and the middle is your contaminants. And hopefully you have nothing in the middle but in a - in the - in the built environment in a restaurant you can control the flooring material and then you've got to design it for the other two. And - and if - I'm not a dancer but - you know - you know when ballet people, they throw like saltrock, whatever it is on - sand on their stage so they don't slip.

Well-- I would say that's a contaminated floor but for them that's so they don't hurt themselves. Right? So, those three things. So, you start with the floor and then you go from there because you - you - you'll always have contaminants in a restaurant. That's why people clean, that's why BJ's was, I forget what they called it, hourly. I call it spot cleaning, it took me a while to understand what they were saying. Every hour they're walking around. And by the way, an hour's probably too long. You know, like most - most - like most environments I've seen 20 minutes to 30 minutes. Like a - like a - like a grocery store, if you walk down the pickle aisle every hour or - you know there's a risk to that. Right? So, start with the floor, go to the cleaning processes. And as I just said, there's - one of the cleaning processes is a spot cleaning, the other side is like the nightly cleaning. And - and those things, if you do those things right you should have a low probability of a slip or trip



for the pedestrians because - and I - as I mentioned, it's a probability event. And I did some work for a restaurant where a woman fell off her stiletto heels or wedges or something at a standup bar table and broke her leg. That's - you know, maybe she was drunk, I don't know but that's - you know, that's - that's the kind of things that they don't - kinda uncontrollable. But the controllable stuff it's start with the floor, go to the - the materials. So, it's a long way of saying what causes this, then it's the analyses. Because I kind, and I - and I hate to say it, I kinda like this case because it's a puzzle. There are - there are so many little pieces in here that - that - that create like dangerous condition. Like in it's - it's the floor finish, even in D2047 and the - and the writings over the last 70 years now because '52 (1952), my gosh, it is 70 years ago, over the last 70 years they recognize floor finish is slippery when wet. Right? Well, that's wet but - but

then there's contaminants. And - and the problem is in this case, because I - I don't have the data to say - you know, and bluntly was it the night cleaning, was the spot cleaning, was it the chemicals they had to use, was it the mops, like what the elements are. But it basically comes down to two things, the - the flooring can contribute and then the maintenance contributes. And - and if you do those two things right you should have a reasonably safe floor. And again, as I mentioned, Ms. Bobalik walked on a floor and it was just her time to be the statistic. But that - that is why I have a hard time saying what caused this because I'm sure you guy like to say oh, it was the grease or it was the soap or it was the mop. I can't tell. It's the system. The floor and then the system.

Q. Is floor cleaning a - a component of floor maintenance? Are those - are those terms synonymous or can you differentiate floor maintenance from floor cleaning?

A. Yes, you can.

Q. Okay. Can you do that for me?

A. So, if you hear the words cleaning and maintenance it's exactly this, cleaning is mops and bucket and chemistry, maintenance is what Foster Flooring did. And the - the - in a tile floor - you know, if they break a tile - you know, maintenance guys will come in and pull a tile out and replace it. So, in - in my world, in my words cleaning is the - the spot cleaning, the interim cleaning the deep cleaning. The maintenance is what like the - the - I shouldn't say facilities because they also in this case are the cleaning guys but the - the - sort of the - it's funny saying maintenance is maintenance but it's maintenance is more we've got to replace a lightbulb, cleaning is dusting the lightbulb. And - and just one of the - every organization has different words. Right? So, that's why - that's how I differentiate cleaning and maintenance and that's why if - there's a magazine called Cleaning and Maintenance Magazine.

Q. Okay. What is your understanding based on

your review of the testimony and documents provided to you in this case of Central Cleaning's responsibilities at the restaurant with respect to the wood floors?

A. What the responsibilities are?

Q. Yes.

A. They - well, that's a great question too. Their responsibility is to clean it.

Q. Alright. And how often do they clean it?

A. Every night as far as I can tell.

Q. Okay. And did you discern from the testimony about when in the day they would - they would clean it?

A. Restaurant closes I think it's 11:00, they - there's some testimony that guys are still hanging out there trying to get out of there at 1:00 in the morning sometimes. So, but basically after close, before open, which is standard cleaner time.

Q. And after the restaurant opens for the day did you discern from the testimony and documents provided to you as to who cleans the floors during operating hours?

A. Well again, your word cleaning. So, the -



Page 77

so, the - I - one of the things I found through this whole process is wet mopping versus damp mopping and in my experience because I've developed floor cleaning chemicals and systems and this is the number that I actually have written and - and talk about all the time, on average to damp mop a floor you need one gallon of concentrated, a diluted chemical PER 300 square feet. I'm sorry, the other way. Wet - wet mopping is one gallon per 300 square feet, damp mopping is one gallon per 600 square feet. Right? And - and there's agitation and there's absorption and release from the mops and all these things. But when you go to the daily stuff that they're doing every hour, it took me a while to realize they're running around a flat mop and a towel and spraying Maxx Dual and wiping it up. And I would call that - and I had a hard time understanding what exactly they were doing, if they were just spot cleaning where they thought they saw something or if they were doing the whole floor. And

Page 78

it doesn't sound like they were doing the whole floor, they were sort of spot cleaning even though they're calling it cleaning. And it's - and the problem with that is - and it's - it's one of the problems with wood floors the - the - that's in this process is they weren't allowed to agitate. And it's like brushing your teeth with wet toilet paper - you know, you just can't get the - the gook off your - your - your teeth. So, if you go around and spray a liquid down and then, I forget what they call it, a spreader, like basically it's a flat mop with a towel, all you're really doing is kinda spot cleaning but not really because you're not - it's not really cleaning. So, that's why I take exception to were they cleaning because I'm not sure if the intent was just to spot clean where they thought they had problems or they were actually trying to clean and - and - and get rid of like a soil, which they would never do by the way as compared to the overnight process because there's just not

Page 79

enough chemical to do anything.

Q. Sure. And - and I appreciate that answer Mr. Collette. Let me try to get at this another way. You - Opinion Number 2 on Page 4 of your report you state, "BJ's was responsible for providing reasonably safe walkways for pedestrians in the restaurant." My question is regardless of - of how that's done, so regardless of whether it's spot cleaning or cleaning the whole floors, my questions is what is your understanding from the testimony and - and documents that you've reviewed about who takes whatever steps are necessary to maintain reasonably safe walkways during operating hours? Is that Central Cleaning or is that BJ's?

A. BJ's. Sorry for the pretty long answer to BJ's.

Q. I'm sorry for the bad question. It will not be the last. I want to talk a little bit about the scope of your - your work on this matter. On Page 2 of your report, and I should preface this question by saying I am not criticizing you for this

Page 80

by asking you this question but I do want to understand your reasoning. Under Scope of Report on Page 2, the second paragraph, "I was asked to determine the cause of the incident which injured Mrs. Bobalik. I did not conduct an onsite inspection as the incident location conditions encountered at the time no longer exists." And first of all, what do you mean by incident location conditions?

A. Oh, I was told the flooring had been changed and that - that it wouldn't be the same.

Q. Who told you that?

A. Hance & Srinivasan.

Q. And did they tell you what, if anything about the flooring had changed since the incident involving Mrs. Bobalik?

A. Actually sitting here I don't remember. I'd have to go back and look if I took any notes.

Q. Okay. Alright. That's fair. I just wanted to - again, I'm not necessarily faulting you for not doing the inspection but I wanted to make sure I understood



Page 81

what you meant when you said incident location conditions. So, your testimony is you did not conduct an onsite inspection because you were told that the flooring had changed from the time of the incident?
A. Yes.
Q. On Page 4 of your report you set forth several bases for your opinions and the first one is, "My education, training and experience in the field of designing, planning, building and mainlining walkways." And I think we established earlier but I just want to be clear for the record, when you say maintaining you're talking about the cleaning of the floor along with the type of work that Foster Flooring, for example, did in this case? That's kind of maintaining is one umbrella and you have cleaning and what else other than maintaining - what else other than cleaning the floors falls under that maintaining umbrella?
A. Well, it's - it's - yeah, it's funny the words we use. You would probably say it

Page 82

would be - maybe I should change that to cleaning and maintaining because again, an analogy for - again, from my background in floor finish, the cleaning of the floor finish is different than a strip and recoat. And a strip and recoat is the maintaining. So, thank you for telling me that. I'm going to go to clean/maintaining.
Q. Okay. So, you would not use - you would use two separate words to differentiate cleaning and maintaining. You would not consider them to be part of floor maintenance or maintaining the floors. Is that correct?
A. You threw me there.
Q. I threw myself. I'm sorry. What I'm getting at is you just said you wanted to change that to cleaning/maintaining walkways, so, that - that is - so, what you're saying here is that your opinions are based on your experience - training and experience in the field of designing, planning, building and you would say cleaning/maintaining walkways. Is that

Page 83

correct?
A. Yes. Another analogy would be most building service contractors will actually do cleaning and maintaining but in the case of - like, for example, Central, they were never asked to apply floor finish and I think in their agreement it specifically says they're not allowed to apply floor finish or wax. I would put that in the - the category of maintaining. They're definitely asked to clean. And so, the BJ's employees, for example, all they're doing is cleaning, they are not allowed to do any maintaining. So, they're not putting floor finish down, they're not doing strip and recoats. So, I would say cleaning and maintaining in the context of what you're asking me is my expertise.
Q. So, given those - those definitions that you just gave me of cleaning versus maintaining, clarify for me do you believe that, and you may have just said this and maybe I missed it but do you believe Central Cleaning was hired only to clean or was it hired to clean and maintain the

Page 84

floors?
A. Having looked at the contract again last night they're specifically there to clean. They're - and as I mentioned, I'm pretty sure it's very clear in there that they are not allowed to apply polish or wax to the floor. And - and - and again, using your categories maintain the floor.
Q. Okay. Then I want to ask you about a couple of - of your opinions just to make sure that - again, you said it's funny the words that we use. I want to make sure that I'm not misinterpreting your words and more importantly that our jury doesn't misinterpret your words. So, for example, Opinion Number 4 on Page 4, Central - "Central was responsible for ensuring they knew how to maintain reasonably safe walkways." Based on what you just told me is that still your opinion?
A. Using your categories I would call that cleaning walkways to the - I would - if in - in the context of the definitions you just split up there I would rephrase that to Central is responsible for ensuring

Page 85

they knew how to clean - let's see, how to - how to clean to maintain reasonably safe walkways. Does that make sense?
Q. It - it does. And again, on the next page, Page 5, Opinion Number 7, "Central was responsible for confirming that the cleaning down by their employees maintained reasonably safe walkways." Is that still your opinion?
A. Yes.
Q. Okay. You would not change the wording there as you did with respect to Opinion Number 4?
A. Yeah, and just, again, just so we get that, so if - I understand you're reacting to the word maintained. It's - let's see, Central is responsible for confirming that the cleaning done by their employees delivered reasonably safe walkways. Would that - just so you - because you seem to be reacting to maintain. But continually have reasonably safe walkways.
Q. Mr. Collette, I'm not trying to rewrite your report. What I'm just asking is I want to make sure that I understand and

Page 86

the jury understands what you believe the word "maintained" means when you use it in this report. So, if you don't want to change any of the words you don't have to. I'm simply asking you if given the discussion that we just had about the difference between cleaning and maintaining floors if you wish to reword any of these opinions and you've answered that question. So, thank you for that. Bullet Point Number 4 on Page 4, the basis for you - or your bases for your opinions, you say, "My knowledge of Commonwealth of Kentucky requirements and national standards related to walkway surfaces." I believe earlier you talked about with Ms. Noble the national standards or some of the national standards, what are the Commonwealth of Kentucky standards or I guess requirements to which you're referring in that bullet point?
A. Well, in the - the Commonwealth of Kentucky has a fire code, a building code, some jurisdictions have property maintenance codes and in this particular

Page 87

case I'd have to look at what I incorporated as opinion development information. I don't think I actually referred to any particular Commonwealth of Kentucky requirements.
Q. Okay. Okay. Let's go up to the second bullet point there, "My research and training courses regarding walkway management (material selection, cleaning and auditing)." We've already talked about in this deposition material selection and cleaning. What is auditing as you use it here in this report?
A. Auditing, if I refer back to ASTM F2948 has a - a description of - of what the qualifications of a walkway auditor-- and what - it incorporates in there what they do. But it pretty much goes back to material selection, the - the maintenance of - I should say cleaning and maintenance of a walkway. The conversations around the design of walkways, like is it a ramp, indoor, outdoor, lighting, mats, curbs because walkways aren't just inside restaurants.

Page 88

Q. Uh-huh, (affirmative response).
A. And then it also discusses inspection of incidents, incident reporting and that is what the auditing is. It incorporates all the activities around the design plan, build, maintain, clean and risk management of a walkway.
Q. Are you aware of any steps that BJ's took to perform that type of audit that you just described with respect to the wood floors at the Oxmoor restaurant?
A. I would say - like so, Gina - it's interesting because she is a - I forget what her title is, like risk manager or safety manager, she starts the process. Like she identifies a hazard - you know, and - and - and talks about the opportunities to do stuff. But that's where - and obviously the conversation starts from like hey, we've got a problem, what we should do. And as a auditing - you know, the first thing you thing about is is the material installed proper for use, then go to the cleaning and maintenance and then evaluate - you know,



what - what - what's - is it correct. Like there's a process for incident investigation. And in that ASTM F2948 it refers to other ASTM Standards. I actually have a whole list of, hey, you have a slip and fall, what do you do and some of it's in the incident report like who is it, what time it happened, what were the considerations. But then it goes into like what are our maintenance processes, what type of flooring was it and cleaning processes. And so, the - the auditing is the process from material selection to actually operating it and everything in between.

Q. Would you include as part of that auditing process or as of methodology for executing that auditing process the verification that the cleaning that was done by a company like Central Cleaning or some janitorial service was done correctly? Would that be part of that process?

A. Yes.

Q. And did you review the - the testimony from Ms. Shankle, the general manager of

the Oxmoor restaurant and others about what they call I believe the opening walkthrough checklist and process? Are you familiar with that?

A. Yes.

Q. Okay. Tell me what you understand about that process.

A. It's--

Q. Actually, I'm sorry, let me - let me clarify. As it relates to the flooring.

A. Yes. Well, yes, it's the only thing I was going to talk to about–

Q. Yeah.

A. – checking the box and it says like floors cleaned or something like - like in a checkbox. The - the - the thing that's again interesting to me is it's very hard to qualitatively assess if a floor is clean. And - and - and the incident we're particularly talking about on the day of the incident she checked the box saying the floor was clean. And the - again, for the operational part of this between risk management, facilities and operations and - and the GM - you know, it's - you can't

- this is going to sound dumb but you can't quantify qualitatively. So, just looking at a floor I don't think, and like as I mentioned, unless it's got a plate of spaghetti or olive oil or water on it you - you can't tell me what it is or isn't until - unless you slip on it or you quantitatively audit it. And - and - and - you know, there's reasons tribometers exists and these standards exists and the research exists so you can understand if something's clean. And - and it's - the morning walkthrough is a visual inspection that I would just say sets the manager up for failure because if she looks at the floor and it appears clean she's going to check the box. But again and again and again in this testimony there's - there's a haze, it's greasy, slick and you can't - you can't quantify a hazard. Slick and greasy are - you know, qualitative descriptions. It should be audited to give a baseline to have a discussion about where you go from there. And that is again back to your question about what

caused this, a whole bunch of stuff.

Q. If - if a restaurant manager like the restaurant manger here at the BJ's Oxmoor location did come into the restaurant and observe that the floors, for whatever reason, were not in the appropriate condition, that they had not been cleaned properly, do you have any opinion as to what responsibilities, if any, that manager would have to either correct or address that issue?

A. I think I'd have to - well, I think they're in my opinions, I mean they're responsible for the location, they're responsible providing a reasonably safe walkway, they're responsible for calling up the building service contractor and going like hey, it's not working. It kinda confused me and I realize Mr., I think is Robinson, the operations person, was only - was - his first visit to the restaurant was the day of this incident but had just come on so all his testimony's kinda post. But it's the - the - the - his expectation was the - they



Page 93

were supposed to - the GM was supposed to meet the cleaning company before they left in the morning to do a positive handover if the results were good. But that's not in the contract. And - and - but it's still BJ's responsibility in the morning if - if they feel it's not good to do something about it. In this case, again, the GM is kinda set up to fail because what's she going to do? Because I did not see one time that Central Cleaning came back and I absolutely could be wrong on that but there was never any or even some overlap between the GM and the cleaning company where they could resolve that. And if - that's a long way of saying yeah, that the GM or the person - the person doing that, I forget what the - the prewalk open or whatever it was called again, and that facility on that they're opening up with a safe floor. Reasonably safe floor, got to use my words, you guys keep saying safe floors.

Q. Understood. Okay. The material selection process that you discussed with Ms. Noble

Page 94

earlier and that you and I briefly discussed, do you have any understanding of what involvement, if any, Central Cleaning has in that process?

A. They should have none.

Q. Okay. What is your understanding from your review of the testimony and documents provided to you of the specific cleaning procedures for the wood floor in the dining area in place at the time of Ms. Bobalik's fall on September 4th, 2018? And I'm speaking with respect to overnight cleaning by Central Cleaning. What was the procedures in place at that time?

A. Well, that - that also is a great question because it depends on which testimony you read. And from BJ's perspective the building - or Central Cleaning is using the DuraLoc, the Dual Maxx or Maxx Dual, they're damp mopping and - and - and if you read Central Cleaning and - and some of the - the BJ's testimony and I'd have to look in my exact notes but they - they aren't - they aren't using the DuraLoc mops. They're - they're - and I - I - I'm

Page 95

kinda confused whether they're using the DuraLoc bucket or they're using their own buckets but regardless it seems to be that Central Cleaning is using the Maxx Dual chemistry that's spit out by the dilution control system provided by BJ's in a bucket. And again, I'm kinda confused still of whether they're using the DuraLoc, I'd have to go back to my notes, or not, like a two sided bucket or one sided bucket. And then - but they're using whatever mops Central Cleaning is bringing in and - and they're not using the DuraLoc mops. The other part of that is best practice cleaning and I - and it's - again, why this is an interesting problem, because wood floors by definition can get scratched. So, if it was a tile floor you get a deck brush or you'd agitate it just like you do with your toothbrush but on a wood floor you can't agitate and that causes a problem in cleaning because the chemistry by definition has to go on as a solvent, meaning it has to get on there and do

Page 96

something. But if it's damp that means you don't get a lot of it. And then if you don't agitate it it means you're not actually breaking the gunk off that's not coming off because you don't have a lot of chemistry. And then if you're - you're not using a double sided mop bucket or the type of mop like, and it took me a while to - I think they're using the grease release mop. The different mop does different things. So, the - and then there's no definition of expectation for how much chemistry should be used for an area. And then - and then what's - what's the process? Because even the DuraLoc launch says like move the mop back and forth vigorously to clean the floor until it's done. Like I - okay. So, it's - so, the process, again, is - is it - there's the BJ's Duraloc process, which isn't very clear. For example, how often do you throw the DuraLoc mops away, it's not in there. How much chemistry should be used in a square foot's not in there. And then - and then Central Cleaning isn't even

Page 97

doing that. So, there's this disconnect on - on - on - that I have - still trying to - depending which testimony you read and even like Mr. Robinson never knew that they weren't using the DuraLoc. And even that - I know that's after the slip but that's kinda telling to me that the operations group isn't - Ms. Shankle, I think her name was, had a lot of responsibilities and wasn't getting guidance. So, what cleaning process, BJ's had one, Central Cleaning had one. There's two.
Q. Do you - do you recall from the testimony any explanation or reasoning that was provided by anyone from Central Cleaning about why they were not using DuraLoc mops? Do you recall any discussion about that issue?
A. I - I don't. I'd have to go back and look at, I think it's Mr. De Leon. The - so, there was the fellow that was managing the cleaners and then the, and I don't have his name in front of me, the person who BJ's was mostly talking to and it may be

Page 98

in my notes. The larger discussion I saw was the - the - the use of the Kaivac, the - sitting here I'd have to go back in my notes to refresh my memory as to if I actually have an opinion about what you just asked me.
Q. Sure. Okay. You mentioned the - the chemical dilution, what is your understanding of who sets that or who established the dilution of the Maxx Dual chemical that's used or the Maxx Dual solution that's used on the wood floors or was used on the wood floors at BJ's Oxmoor?
A. So, just - I'm not sure if it's clear in my CV, so what I did at Diversity was I was on the Dilution Control Team for these things and then we launched at Cintas dilution control base chemical delivery. At Cintas we serviced over a million customers a week with mats, mops, uniforms and chemicals. And that dilution control system basically proportions a relation between the chemistry that's concentrated and water. And the reason you do that is

Page 99

because you don't want to have to ship water around the United States, you want to ship concentrated chemistry. So, when that chemistry gets put into a restaurant like BJ's there's a little plastic tip called the dilution tip that's put into that proportioner that spits out the relationship. And if you go look at the specification sheet for any chemistry that goes through dilution control it'll have a ratio of water to chemistry but you can change that ratio. And - and I noticed there was a couple of conversations about let's call Ecolab and get them to like tweak the chemistry, which they'll go but normally you do that for like a dishwasher or a pot and pan. Floor care is kind interesting, you don't necessarily want to tweak the chemistry but the - so - so, when they install that they will talk, them being Ecolab will talk with BJ's and say here's what we're going to set up in here and for two reasons, one is it affects the performance of the chemistry, it also affects the end use cost. Like

Page 100

so, you can imagine if you go to percent chemistry and you're using a gallon a day you're going to spend a lot of money when normally this stuff is diluted at one to 256 - you know, so - so it's - BJ's should know what the concentration is to set it, is where I'm going with this but Ecolab is the one that actually gets in there and tweaks it.
Q. Okay. You mentioned that dilution can affect the performance of the chemistry. Tell me what you mean by that.
A. Well, if you look at the specification sheet for Maxx Dual, it actually has two concentrations that you can use. One is daily cleaning, one is, I don't know if it was strip and recoat, or there was more of a heavy dilution. And if you look at one of the - the Maxx Dual spec sheets it actually says on it, "Be careful over using Maxx Dual on floor finish as it can have permanent affects to it." And so, you - so, two things happen when you change the concentration. If you under dilute it you can actually wreck something



Page 101

because you can harm it from the material side of it. You also can leave residue. So, I mean the analogy would be you take Dawn dish soap and you pour it in your hands and you rub your hands together and let it dry. Your hands are going to be super sticky because you didn't get rid of anything. But if you actually put your hands into your sink when you're washing you're not going to really feel the - the remainder if you let it air dry. That's putting too much chemistry down. The other way is if you don't have enough chemistry it doesn't clean. So, water is a universal solvent, that's why we mop with water in chemistry. Because you want to put it down, get the chemistry out, let it do its thing but you need that extra liquid to bring the - you know, the contaminants back up in the mop to get it off the floor. So, if you tweak the concentration you can either damage your floor or not clean your floor or - or make it even dirtier.

Q. You referred to this case earlier as a

Page 102

puzzle and I don't necessarily think that most people on this who are involved in the case would disagree with that. Did you - do you have any opinion or - or - or observations about what role, if any, the dilution of the Maxx Dual cleaning solution may have played in Ms. Bobalik's slip and fall incident?

A. The - the short answer to this is, I don't know because that's what a walkway audit would've done. Because you - you - there are multiple things you can change here. The first one you can't change is you have this floor finish and - and the concentration of the chemical is part of that discussion around contaminants and cleaning after that. And it - it - it may have but I - I can't say.

Q. Did you review any testimony or do you recall reading any testimony about concerns by various individuals at BJ's and Central Cleaning about the dilution of the Maxx Dual cleaning solution?

A. The, and I - I don't remember his name, the guy who was the head of the safety

Page 103

committee was talking about we got to get Ecolab to tweak it and that, again, is a qualitative assessment because like he's - he's trying to react to the slick greasiness and we're having problems, so let's tweak the chemistry. That's - that's - you know, cut off your arm because your finger's itching kinda response. It's not a quantitative analysis of cause factors. And - and again, the - the - the - it could be part of it but I - I - it's - it's - I can't tell that it 100 percent was, it definitely is part of it.

Q. You mentioned that you reviewed the janitorial service agreement last night I think you said between Central Cleaning and - and BJ's, so you're generally familiar with that document. Correct?

A. Yes.

Q. And did you see at the end of the document the schedule attached, it's three pages that sets forth the cleaning specifications for the restaurant? Do you recall that document?

Page 104

A. Yes.

Q. I know you don't have it in front of you but I will represent to you that the document - the first page of that schedule, the third item relates to the cleaning procedures for the wood floor. Do you recall reviewing those procedures on that document?

A. Yes but I don't remember the details.

Q. I'll give you some. Give me one second. The second bullet point on that under Wood Floor states, "Damp mop the floor nightly using PH neutral cleaners so as to not damage the wood. Never apply a wax or finish to the wood floors. Only mop the wood floors with Ecolab Oasis 100." There's a lot there so let's unpack a couple of things. First of all, is Maxx Dual a PH neutral cleaner?

A. Well, so, I have to ask - kinda answer this in a long winded way, I apologize. So, this contract was signed before they launched the - the Maxx Dual DuraLoc system, so they weren't doing that system - I'll rephrase that; the question you're



Page 105

asking me is the notes in that contract don't apply really to the scenario at the time of the incident and what I inspected. But it again shows me that - and I read over the DuraLoc launch but the - the - totally different scenarios. So, the instruction sheet in that appendix doesn't - it has nothing to do with what they were actually doing at the time of the incident.
Q. And I appreciate that but what I'm getting at, Mr. Collette, is that when the contract was first signed the procedure that was in place was to use a PH neutral cleaner. Is that your understanding?
A. Yes.
Q. Is Maxx Dual a PH neutral cleaner?
A. No.
Q. Okay. So, it also references Ecolab Oasis 100. Are you familiar with that product?
A. Yes.
Q. Is that a PH neutral cleaner?
A. Yes.
Q. So, is it your understanding that at some point in time BJ's made the switch from

Page 106

using Ecolab Oasis 100 on the wood floors, which is a PH neutral cleaner to using Maxx Dual, which is not a PH neutral cleaner?
A. You asking me - yes, they did.
Q. Okay. Do you have an opinion as you sit here today on which of those two products as between Ecolab Oasis 100 and Maxx Dual is the more appropriate product to be used to clean the wood floors at the BJ's Oxmoor restaurant?
A. Are you asking me if I have an opinion?
Q. Yes sir.
A. Well, I - I - the Ecolab specifications, they have like an 80 or 90 page document on different floor types. The very last page of that PDF actually has a table that shows the different flooring and - and it goes over to wood and then it talks - and there's a vinyl section in there. They don't really have a floor finish section. Normally VCT and vinyl, sheet vinyl have floor finish put on it, so it's the process. Ecolab has marked it appropriate for wood and - and - and in sheet vinyl.

Page 107

But having said that the - the - I could see there's a name that pops up on one of these things, it's the national accounts of EP for Ecolab that's got BJ's as their - you know, corporate accounts guy and - and - but he's a sales guy, not a technical person. So, somewhere in there somebody has been talking to them about Oasis versus Maxx Dual. But there's also they were using Wash and Walk in the kitchen previously and - and so, there was a - a - a decision made in there and - and I know - I know Kaivac very well Kaivac very well and the system that Gina brought in is basically a wet vac that spits out chemical and it's got this goofy little, I shouldn't say that, it's got a scrubby brush on one side. And Wash and Walk basically, and a long story but Wash and Walk is used in the kitchen only. You throw it down, you deck brush it, you squeegee it into drains. Can't use it in the front of the house, no drains. So, they had Wash and Walk in the kitchen, they had Oasis 100 outside, which is a

Page 108

neutral cleaner. The only reason, and I have to no - no - not in any testimony because there's no decision process explanation, Oasis being a neutral cleaner, it's a good neutral cleaner. It's what you use in like a - a shopping mall or a office building. Alkaline cleaners, the Maxx Dual, are where you use where you have grease problems like a restaurant. So - so - and - and I - I - I see no testimony, don't have any evidence but so, they went from a neutral cleaner to an alkaline cleaner. It's interesting because - you know, normally only kinda make those decisions if you've got to get rid of greasy contaminants. So, they went all the way across because - you know, they have it in the kitchen, they got the wet vac so that's - you know, they're supposedly cleaning better and then they got one chemistry across the board. So - so, someone along the way, a decision was made and - I - and - and I don't see any testing though is where I'm going with this to see in this location, which seems



Page 109

to be an anomaly across BJ's, it's got this wood floor with floor finish, to see how it was going to perform on the floor finish and do any kind of testing. Because normally a company like Ecolab and coming from Diversity in like - was that - started with that company in 2000. We're part of Unilever. We each owned 20 percent of the global commercial cleaning products in the world. We did McDonald's and they still do McDonald's, I shouldn't say that anymore, I don't know. We did at the time all McDonald's restaurants in Europe, Ecolab had North America. So, we go in in a national accounts and we go do a floor test because you definitely don't want to change your chemistry and have them (audio cuts out.) result. And so, they - they - they - this change to Maxx Dual seems to come along at a certain date and it just got rolled out but I don't see any decision making process or trials anywhere that - that they did, I'm hoping they did that somewhere. But in this case with this one floor I don't see anything

Page 110

that specifically did that conversion.
Q. Do you have any opinion as to whether that conversion was an appropriate conversion to make from the Ecolab Oasis 100, which is PH neutral, to the alkaline Maxx Dual solution?
A. I do have an opinion. It's on the surface it's an appropriate cleaning chemical but as the testimony shows, something's happening in there and I can't - and again, puzzle, I can't tell if it's the floor finish, I can't tell if it's the chemical or the cleaning process, the interaction of the system is - is failing because there's a lot of talk about slick and grease and - and a dry hazard. And so, it - on the surface from a specification point of view if you ask me can I use either on floor finish, I go yeah, just don't over concentrate the chemistry because it also can affect your floor finish.
Q. Okay. Number - Opinion Number - Number 9 on Page 5 of your report, I'm not going to go through all your opinions Mr. Collette,

Page 111

just the - just the ones primarily that pertain to Central Cleaning. This opinion, Number 9 reads, "Central knew or should've known that their employees did not follow the BJ's gold standard of cleaning." Tell me what's the basis for that opinion?
A. When they launched, them being BJ's, launched the DuraLoc and Kaivac system there's Central Cleaning - the gold standard of cleaning process for BJ's has now become Kaivac on that slate floor, DuraLoc and Maxx Dual on the wood floor. When that rollout occurred Central Cleaning never adopted that process. And from what I understand all of Central Cleaning's employees, and I - and I probably shouldn't call them employees, they're really subcontractors but they are responsible for their performance, weren't doing the process that BJ's told them to do and so, Central Cleaning knew that they weren't doing it.
Q. What are you basing that conclusion on?
A. Well, the - the - the fact that the

Page 112

conversations from, again my notes have that all in detail, between the - I think Ms. Shankle and the fellow who was responsible for sales of the - of Central Cleaning discussing that and then again, Mr. De Leon. I'd have to go back and look at his notes. Basically it's - it's very clear that at the time they launched the DuraLoc system Central Cleaning never adopted it and just kept using their own mops, which Central Cleaning knew that.
Q. You also mentioned the Kaivac system. Is it your understanding that Central Cleaning did not adopt the Kaivac system for use on the slate tile floors as well?
A. I - I'm fairly - and again, I'm only really concerned with the day of the incident and because it - the use of the Kaivac on the slate floor also part of the puzzle is - is part of that gold standard of cleaning they rolled out when - when they rolled out DuraLoc. BJ's put out a document saying here's what we're going to - we're going to do Kaivac in the kitchen, we're going to do Kaivac on the slates for



the night crew and we're going to do mops in the dining room and BJ's people don't touch the mops. And so, the Kaivac was part of that for - and I do not remember exact dates but for a while the Kaivac was not being used and after the incident date of like September 4th, 2018 I have no idea if they adopted it or not. I think they did but I - it's not part of my opinion.
Q. And you did review Daniel De Leon's testimony in this matter. Is that correct?
A. Yes.
Q. And do you recall him testifying that Central Cleaning did in fact use the DuraLoc mop bucket on the wood floors?
A. Well, the mop bucket or the handles and - and mops?
Q. I'll get to that in a second. Don't worry, I'm going to give you a chance to talk about the various components. Right now I'm just talking about the mop bucket itself.
A. Yeah, there - and again, a lot of testimony in this case. There - the - I'd

have to go back and look in my notes. Sitting here I don't remember if they adopted the mop or not. I'm talking about the whole DuraLoc/Maxx Dual - I shouldn't air quote there, process that BJ's launched and I'm not specifically picking on whether they used components or not, just that the - the totality of the system wasn't being used.
Q. Do you know who supplied the system? I'm not talking about - obviously it was a Ecolab product. What I'm asking is was it BJ's or Central Cleaning to your understanding who actually was responsible for purchasing and supplying the - the DuraLoc system?
A. BJ's.
Q. Okay. Is that the bucket, is that the mop, is the whole system? What specifically are - when you say they were responsible for supplying it, what specific components are you talking about?
A. My recollection is BJ's should be able to walk in and clean the floors without bringing anything in.

Q. You mean Central Cleaning?
A. Sorry, yeah, Central Cleaning should've been able to clean the wood floors without bringing any things into the facility. The only things that they weirdly were bringing in their own bathroom cleaning chemicals.
Q. Uh-huh, (affirmative response).
A. And - but they - but all floors and I - and I apologize, I do not remember if they cleaned the bathroom floors or not but the - but the wood floor specifically around this incident, they should've been able to walk in and bring nothing.
Q. Do you recall any testimony from Mr. De Leon or any other witnesses in this case to the effect that the Duraloc mops were not available for use? Do you recall that?
A. Yes, I saw there - there was a conversation about a handful of times but I don't have quantitative like this date, these days.
HON. SRINIVASAN: Eddie.
HON. O'BRIEN: Yes.

HON. SRINIVASAN: If you're at a break--
HON. O'BRIEN: Yes.
HON. SRINIVASAN: --a breaking point I would like to take a quick restroom break.
HON. O'BRIEN: Let's do it. Five minutes, 10 minutes?
HON. SRINIVASAN: Yeah, that's fine.
HON. O'BRIEN: Okay. Be back--
VIDEOGRAPHER: Is all in agreement to go off the record?
HON. O'BRIEN: Yes.
VIDEOGRAPHER: We are off the record at 12:36.
(OFF THE RECORD)
VIDEOGRAPHER: We are back on the record at 12:46.
CONTINUED CROSS-EXAMINATION BY HON. EDWARD O'BRIEN:
Q. Mr. Collette, earlier you in your testimony in response to Ms. Noble's questions, you referenced that there were some slip and fall incidents that you recall happening at like 7:00 at night or later. Do you recall that - that line of questioning and testimony?
A. Yes.
Q. So, I assume from that answer and from



Page 117

your report that you reviewed the incident reports that have been produced in - in discovery in this matter. I believe there's about 32 of them between 2014 and 2020. Have you reviewed those documents?
A. I'm not sure how new but yeah, there was at least 20 plus. They're in my case note.
Q. Over several years. Correct?
A. Yes.
Q. Okay. Did you take note or were you able to quantify on a percentage bases or just a numerical bases how many of those slip and fall incidents occurred in the afternoon and evening hours as opposed to occurred in the morning hours shortly after the restaurant opened?
A. Sitting here, I do not know but they're in my case notes because I wrote down whether it was wet/dry and what time of day.
Q. Okay. Let's go to Page 8, Mr. Collette, of your report. This is kinda the last area I want to ask you about. That big paragraph in the middle that begins, "In my experience–" the lower - the lower

Page 118

third of that talks about a method of qualitatively testing for contaminant buildup by taking a white towel and wiping the floor and you reference some testimony in this case about that method being used at a - at a point in time. Do you see that in your report?
A. Yes.
Q. And you note in your report that, "Testimony shows that BJ's employees demonstrated multiple times after the incident that there were contaminants on the floor using the white towel method." Do you recall as you sit here today how long after the incident those - that documentation of those - that white towel method, whatever you want to call it, when that was done?
A. No, not - not sitting here specifically. I think they were pretty quick but I'm not - again, I'd have to go back to my notes because it's in there. I'm not - I'm not even 100 percent sure sitting here if it was before the incident or if it was all after September 4th, 2018.

Page 119

Q. If - the other Counsel can object or correct me if I'm wrong but obviously you know that the incident at issue in this case occurred on September 4th, 2018. Correct?
A. Yes.
Q. If I were to represent to you that it was not until January of 2020 that there was any photographic evidence of this white towel method would that be consistent with your recollection or you still don't know?
A. I am pretty sure Mr. Robinson was fully director of operations when that was occurring, so that's more likely than not after September 4th, 2018.
Q. Okay. And the reason I ask you this, Mr. Collette, is - is you - you go on to say if the white towel method is done first thing in the morning - "If the white towel method is done first thing in the morning with the expectation that the floor surface is the cleanest it will be as it was just cleaned and the white towel collects dirt, the reasonable conclusion is that the cleaning procedure done by

Page 120

Central Cleaning is either not sufficient or not being done properly." Is that still your opinion today?
A. Yes.
Q. But can you really render an opinion to that affect other than dates on which we have photographic evidence provided by BJ's of them doing this white towel method and having dirt come up on the towel?
A. It - if this was even - not even this case, if the - the expectation is, and it's why actually you do walkway auditing first thing and after a clean and then the lastest (sic) at night to see the maximum contaminants because you want to see what's the best it's going to be and what happens by the end of a cycle. And in a restaurant it's when they close. I mean that's - that's the worst it's going to be. And in the - the white towel, and I understand that - you know, even - even if this was a year and half later it's a good qualitative test to go wipe the floor and say look at all this stuff. All that does, it should trigger a discussion



around what's going on. And - and it's - and this - my last sentences there is saying if procedure's not done properly it's, in this case Central Cleaning's responsibility, they didn't do it right. But there's also the responsibility of BJ's to make sure that the process is correct in the first place. So, that's - this just gives you the - that last, what is it, sentence is basically saying that there is contaminants if - if, and that's an if there, if the white towel method brings up stuff this is what you should have happen next.

Q. Okay. I understand that but let's go onto the next paragraph, which states, "Though the testimony data is post incident the floor is the same, the chemistry is the same and the process is the same. It is more likely than not that the level of remaining contaminants as noticed in the testimony were the same as the level of the remaining contaminants at the time of the Bobalik slip and fall." Is that still your opinion today?

A. Yes because the - if over the time period post Duraloc launch/Maxx Dual conversion all these problems occurred--

Q. Uh-huh, (affirmative response.)

A. -- and the - and - and what I'm saying when the testimony - because all these depos are - are after the fact and basically my analysis, you know, is of cause factors. Comes back to is it - it's more likely than not that the BJ's operations and maintenance/facilities, the process wasn't good and the - and the - and all this testimony with the facts I've been given, the floor is known and frankly because it's a really flat surface, I don't care if it's wood or VCT, the floor finish is known, the process is mostly known because you can tell there's a chemistry and there's some tools in there and the contaminants are the same. So, the - because it's - it's not become like a daycare, it's still - it's still the same restaurant. So, the conversation around the floor and the contaminants and the process hasn't changed. That

conversation about the black towel is - is an interesting annotate around there's visible soil coming off this. All I'm saying with that is that should in 2020 should've even sprung up a conversation around a walkway audit to understand the constraints of what's going on.

Q. But does the - does the condition of the floors at BJ's in 2020 as documented in these photographs depicting this white towel method that we've been discussing, does that tell you anything about what the floors were like on September 4th, 2018?

A. Again--

HON. SRINIVASAN: Objection. Asked and answered. Go ahead.

WITNESS: The floor's the same, contaminant's the same and from what I'm understanding the process is fairly same and I get - you know, they - were they using Duraloc mops, weren't they, like - but it's basically the same. So, it's more likely than not that the results are

the same. Absolutely agree 100 percent, I have to rephrase this, I can't 100 percent say that this was the condition of the floor at the time of the incident. What I can say it's the - the process and the flooring and the contaminants are the same, so it's more likely than not when they did that wipe that it's - it's the same kind of a result. Not - not saying that any - like who's responsible for it sitting there but it's just it's more likely than not that the flooring and the process and the operations were - were - needed work.

Q. You say, "Though the testimony data is post incident the floor is the same." Didn't you tell me earlier that the floor is different than at the time of the incident?

A. And I totally agree with you. I do not know when that floor changed. All I know



Page 125

is it wasn't worth me going to look at it to do a walkway audit.

Q. So, in reaching this - this conclusion that - that I just quoted to you would it be fair to say that you're making certain assumptions in the conclusion?

HON. SRINIVASAN: Objection to form. Go ahead.

WITNESS: Well, if - if - if I was - I'll just answer it this way, is if I knew exactly what the flooring material was, the floor finish was, if - if that had changed at all, the contaminants are going to be the same and the process is going to be the same. So, I would answer like I would give you that if the floor finish had changed or - or if it wasn't a smooth surface.

Q. What if the person cleaning the floor was different in 2020 than the person cleaning the floor on September 4th, 2018? Would that have any affect that you could - that you could see on the - on the condition of the floor?

Page 126

A. Well, as I mentioned, cleaning - Central Cleaning is responsible for the people that are doing the work and I understand they're subcontractors, so there's an expectation from BJ's that whoever is cleaning their floor is going to be following a process. And there's an - as - as - as an auditor my expectation would be whomever is in there doing the work will be following the process that everybody has done and that Central Cleaning would say well, yeah - you know, you're not - you're not doing this correctly, here's my process. So, you're absolutely correct a different person will have a different result but that's the - the responsibility of managerial oversite in the process to begin with.

Q. I understand that and I'm not asking you about Central Cleaning's responsibility or the cleaner's performance. What I'm asking you is does having a different person, I believe you just answered this but please - please clarify or confirm so I don't misunderstand your answer. Having

Page 127

a different person cleaning the restaurant floors in September of 2018 as opposed to January of 2020 could result in different outcomes as to the condition of the wood floor at BJ's. Is that fair?

HON. SRINIVASAN: Objection. Asked and answered.

WITNESS: It's - it's more likely than not that - I'll rephrase it a different way. It - it - the person doing the work shouldn't make a difference if the tools and the process are proper and the training's proper. So, I absolutely agree that Monday morning if someone showed up and they were sick and just didn't feel like they could survive and they didn't do the level of clean they're supposed to do, absolutely the person makes a difference. But as a - as a cleaning provider, Central Cleaning is providing a result using a certain process on floors so the results should be

Page 128

the same regardless of the person doing it. That's the reason you have training and process.

Q. Is it your opinion that because the wood floors at BJ's restaurant may not have been properly cleaned by Central Cleaning in January of 2020 that that means that they were not properly cleaned on September 4th, 2018?

HON. SRINIVASAN: Objection. Asked and answered. Go ahead.

HON. O'BRIEN: Objections are limited to the form of the question. Go ahead, Mr. Collette.

WITNESS: Actually my - my intent of that actually is more the other way around, not Central Cleaning. It's if the result is not meeting an expectation two years after a slip and fall that we're looking at there should've been a -a - a BJ's operations, risks, facilities discussion about what's going on. So, the fact



Page 129

that there's this qualitative black wipe thing is more a failure of BJ's to - to look at it and it's like why is that happening and it's - it's more of a look - look - the process they should've done pre 2018 more likely than not hasn't happened by 2020.

Q. Do you know how many times or did you see in your review of the file materials how many times this white towel method was performed and documented by BJ's?

A. Yeah, I think you actually asked this in a depo. Like it's - it's only two or three. Like it's not very many.

Q. Okay. Two or three over, do you know how long of a period of time?

A. Yeah, I think you asked that question too. It was years.

Q. Well, you - you have a greater memory of the questions that I've asked than I do. So, I appreciate your diligence on that. Did you get any impression, just a couple of final questions for you, Mr. Collette,

Page 130

did you get any impression in your review of the testimony or documents provided to you by Counsel about the frequency with which BJ's would register complaints or dissatisfaction with Central Cleaning's performance to Cental Cleaning directly?

A. Yeah, you asked that question too. And - and it's - the answer was there's not very many documented things. And I think your question and the - the answer was something like they should've been using their switchboard and can they run a report and there's really nothing on switchboard. So, even though over the years prior to the incident and even to 2020, which I realize is - is post incident, there doesn't seem to be a lot of switchboard activity that anybody can pull up saying we have a problem, we have a problem, we have a problem.

Q. You mentioned that there had been some testimony and I'll represent to you that it was by Ms. Erin Perkins who witnessed this - the aftermath of Ms. Bobalik's fall, you mentioned that you had seen some

Page 131

testimony that the floor may have been wet. Do you recall that?

A. Yes.

Q. If the floor was wet at the time of the incident would it have been the responsibility of BJ's or the responsibility of Central Cleaning to correct that problem?

A. BJ's.

HON. O'BRIEN: Okay. Mr. Collette, at this time I don't have anymore questions for you. Ms. Noble may have some or Ms. Srinivasan may have some. And I can't promise I won't have any followups but for right now I'm done. Thank you very much for your time sir.

HON. NOBLE: I do have some followups if - if Plaintiff's counsel doesn't have any questions to ask.

HON. SRINIVASAN: Go ahead Sarah. If I do I'll finish up in the end.

HON. NOBLE: Okay.

REDIRECT EXAMINATION BY HON. SARAH NOBLE:

Page 132

Q. Mr. Collette, I just want to refer with more specificity to your opinions that Mr. O'Brien brought up, a couple of them with regard to Central Cleaning. Your Opinion Number 7 on Page 5, "Central was responsible for confirming that the cleaning done by their employees-", I think there may have been some discussion of potentially changing a word there from maintained to delivered, "reasonably safe walkways." Can you expand upon what you mean by that opinion?

A. Yes, the - the - BJ's hired Central to do work and I know there's a discussion of what tools and process and stuff but once - once BJ's has delivered an expectation of a - of - of a job or work there's a deliverable expected. And - and Central Cleaning used subcontractors, not employees and I know - you know, there's discussion was there one or two people and did they change and how often. But regardless of who was actually doing the work, Central was responsible for ensuring that what got delivered to BJ's in the



Page 133

morning met BJ's expectations for, how did I say it, reasonably safe walkways.
Q. Okay. Thank you. And then similarly Opinion Number 9, which you and Mr. O'Brien discussed regarding Central's knowledge or the fact that they should have known that the employees or subcontractors did not follow BJ's gold standard of cleaning. What impact did Central Cleaning's failure to adopt that gold standard have on creating the issue that we're discussing today with the floor?
A. Well, they the gold standard of cleaning incorporated the mop, the bucket and the chemistry in a process and Central knew that their employees hadn't fully adopted the - the system. So, there - there is a - an opportunity, not in Gina's phrasing but there was an opportunity for cleaning to not occur well. And the system had been adopted, whether it was right or wrong, it was Central Cleaning's job and that's what they got hired to do, to follow that process. And - and the - if

Page 134

they followed that process, again if BJ's had developed a good process, the expectation would be that you'd have a reasonably safe walkway. If you don't follow that process there's a risk that you don't get a reasonably safe walkway.
Q. So, according to your opinions to the extent that contaminants may have built up on the flooring at issue here, who was responsible for - for that buildup? Was it BJ's or Central Cleaning or - or both?
A. Well, in - in the - I mean my last paragraph of my opinions the - the contaminants - you know, so the - and I'll phrase it this way, it's - it's the - the dangerous condition was more likely than not caused by the operations and the risk management program. And I'll actually - I probably should add the facilities team because that's Amy Shankle, it was. But it's also more likely than not the inadequate floor maintenance program execution and management by Central. And then - then - then it's the - more likely not the contaminants and the process. And

Page 135

- and the last part is - you know, more likely than not the damp mopping was being done nightly using a string mop will build up contaminants. And so, the - the contaminants are results of these other things and the - the - both BJ's and Central are responsible for that.
HON. NOBLE: I think that's all the questions I have. Thank you.
HON. O'BRIEN: I do not have anymore questions. Thank you, Mr. Collette.
WITNESS: Thank you.
HON. SRINIVASAN: Thank you. No questions for me.
VIDEOGRAPHER: Are we in agreement then to go off the record?
HON. SRINIVASAN: We are.
HON. NOBLE: We are. Thank you, Mr. Collette.
VIDEOGRAPHER: This concludes today's video conference deposition of David Collette. We are going off the record July 21st, 2021 at 13:07.
(FURTHER THE DEPONENT SAYETH NAUGHT.)

Page 136

NOTARY CERTIFICATE

I, William L. Bruner, IV, a Notary Public in and for the State of Kentucky at Large, do hereby certify that the above and foregoing deposition was taken via Zoom Teleconferencing for the purpose stated in the caption; said witness having been duly sworn by me before giving his testimony; that the deposition was first taken in shorthand and a true, correct and complete transcript is contained in the foregoing ONE HUNDRED THIRTY-FIVE (135) pages of typewritten matter; no request having been made of me, the deposition was not read or subscribed to by the witness.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties hereto, or do I have any interest in the outcome or events of the action.

Witness my hand this 2nd day July, 2021.

[signature]

WILLIAM L. BRUNER, IV
NOTARY ID. NUMBER: 613319
My Commission expires: 12-18-22



WITNESS CERTIFICATE

Our Assignment No. J7225814

Case Caption: U.S. Dist. Court, Western Dist. of KY, Louisville Division, Civil Action No.: 3:19-cv-661-GNS, Sandra Bobalik, et al vs BJ's Restaurant, et al

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of ___________, 20___.

______ changes noted ______ no changes noted

____________________ ____________________

DAVID COLLETTE NOTARY

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

David Collette

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

David Collette

REPORTER'S PAGE

CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original required seal.

